### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**ANTHONY GABRIE MANSOOR, III, VIRGINIA CLARE MANSOOR, and STEVEN SCOTT MANSOOR,**
　　　　Adult Children and Beneficiaries of Anthony G. Mansoor, Jr., Deceased; and
**VIRGINIA P. MANSOOR,**
　　　　Wife and Beneficiary of Anthony G. Mansoor, Jr., Deceased, and next friend of **MARY KATE MANSOOR**, Minor Child and Beneficiary of Anthony G. Mansoor Jr., Deceased,　　　　　　　　　**PLAINTIFFS**

**vs.**　　　　　　　　　　　　　　**CIVIL ACTION No.: 3:23-CV-4-HTW-LGI**

**FIDELITY LIFE ASSOCIATION**　　　　　　　　　**DEFENDANT**

### ORDER

**BEFORE THIS COURT** is ECF No. 65, **Fidelity Life Association**'s ("Defendant" or "Fidelity") Motion for Summary Judgment.  Opposing this motion are:

- the Adult Children and Beneficiaries of Anthony G. Mansoor, Jr., Deceased:

  - Plaintiff **Anthony Gabrie Mansoor, III** ("Brie");

  - Plaintiff **Virginia Clare Mansoor**; and

  - Plaintiff **Steven Scott Mansoor**; and

- the Wife and Beneficiary of Anthony G. Mansoor, Jr., Deceased, and next friend of **Mary Kate Mansoor**, Minor Child and Beneficiary of Anthony G. Mansoor Jr., Deceased:

  - Plaintiff **Virginia P. Mansoor**

(collectively "the Plaintiffs" or "the Mansoor Family").

## I.    BACKGROUND

In September 2017, just three months before his death, Anthony G. Mansoor, Jr. ("Anthony"[1] or "the Decedent") took out a $500,000 life insurance policy with Fidelity.  He named his son, Anthony Gabrie "Brie" Mansoor, III as the primary beneficiary, and his daughter, Virginia C. Mansoor, as the contingent beneficiary.   In the margin of at least one copy of the policy, Anthony scrawled an instruction for Brie to "use [the] funds for general household expenses to support [the] family as directed by his mother, Virginia P. Mansoor" (Anthony's wife, also known as "Ginny").  The policy included a "Suicide Exclusion," where, "if the [i]nsured die[d] as a result of suicide … within two years," Fidelity would "refund" the premiums paid—but "no other benefit will be payable."

On December 15, 2017, Anthony was driving a Dodge Ram on Highway 32 in Yalobusha County, Mississippi.  The vehicle left the road and smashed into a concrete wall in a culvert.  A passerby stopped to investigate and, finding Anthony alive and struggling for air, attempted to render aid.  First responders arrived and, while placing him on a stretcher, discovered that he had a gunshot wound in his side.  Anthony died before he could be taken to the hospital.

The events leading to Anthony's death lie at the center of this suit.  The parties fiercely dispute the salient occurrences.  Fidelity has recreated the death scenario much differently from that proposed by the Plaintiffs.

According to Fidelity: Anthony was employed by a company called Action Auto, owned by his friend William Alias.  Alias allegedly fired Anthony in early September 2017.  Poor performance, supposedly, was Alias' justification.

---

[1] This Court, herein, generally refers to Anthony G. Mansoor, Jr. as "the Decedent," but refers to him as "Anthony" in this introductory section to prevent confusion.

The company soon came to believe, however, that Anthony had been embezzling from Action Auto by selling the company's vehicles and pocketing the proceeds. Anthony then took out a life insurance policy with Fidelity. He allegedly lied to Fidelity about his employment. He also purportedly lied to Fidelity about his income used to acquire the policy. Anthony supposedly met with Alias, confessed the embezzlement, and, in an emotional state, expressed that he wanted to commit suicide. Alias referred Anthony to a counselor. Anthony allegedly expressed to the counselor that he had thought about killing himself in his car, so that the incident could be ruled an accident, and not suicide under the policy. His family, consequently, would be eligible to receive an insurance settlement. Distraught at his financial situation and wracked by guilt, staring down impending criminal charges and a warrant for his arrest, Anthony supposedly then purposefully crashed his car into a culvert. Minutes previously, he had left a voicemail with the police, stating that he was on his way to surrender himself. When the accident did not kill him, Fidelity says, he shot himself in the side with a shotgun and died of suicide.

The Mansoor Family submits a different story: Anthony, a through-and-through family man, successfully had raised educated children with his wife. While he was ultimately fired in 2017, he supposedly had not yet been fired—or perhaps had not yet learned of his firing—when he applied for a life insurance policy in September. Anthony and his family were staying away from home, near Oxford, Mississippi, and he frequently could work remotely. Later, after he was fired, despite expressing distress about his financial situation, he started his own automobile business, excited about turning things around. Then, on December 15, 2017, nearby where Anthony had been hunting with a family friend, the Mansoor Family contends that he unintentionally veered off the highway and struck the culvert. At that point, the Mansoor Family

says, his shotgun (which had been malfunctioning) jumped from the impact and misfired into his side, accidentally killing him.



In the initial investigation into Anthony's death, Mississippi Bureau of Investigation agent Lieutenant Bryant Sullivant, after conducting interviews, opined that Anthony had committed suicide. The coroner's office, concurring in ruling the mishap was a suicide, issued the death certificate, stating a similar scenario of the manner of death.

Believing that Anthony would not have committed suicide, the Mansoor Family sought to change the suicide narrative. After hiring a lawyer, the Mansoor Family went to Chancery Court seeking an amended death certificate through a statutory process. The respondents in the proceeding were the Mississippi State Department of Health, the coroner, and the chief medical examiner. The Department of Health filed an answer, while the local medical officials defaulted.[2] The Chancery Court, after a hearing wherein the Mansoor Family presented evidence,[3] found that

---

[2] The Chancery Court, having found that the coroner and chief medical examiner were served—but had not appeared in, answered, pled in, or otherwise defended the action—entered default judgments against them.

[3] The Mansoor Family contends that it presented evidence as described in its Chancery Court Complaint, which is attached to the Mansoor Family's brief at ECF No. 71-3.

Anthony died due to an accident and ordered the Department of Health to correct his death certificate to so reflect. Meanwhile, the County's chief medical examiner had performed an autopsy and noted that the manner of death was "undetermined."

The Mansoor Family thereafter filed a claim on the Fidelity policy, submitting the amended death certificate. A claims consultant working with Fidelity then contacted the Mansoor Family, and the Mansoor Family's counsel forwarded more requested documentation and participated in an interview.

In June 2022, Fidelity denied the claim based on the Suicide Exclusion. In the letter, Fidelity claimed that, according to the medical examiner, the manner of death was listed as suicide, and was not amended. Yet, Fidelity noted, the death certificate, which the Mansoor Family had submitted, had been altered, supposedly without the knowledge of the medical examiner.

The Mansoor Family's lawyer responded, explaining that the death certificate had been amended, and attached the Chancery Court judgment ordering this. The Mansoor Family requested a reversal of Fidelity's decision. Believing that Fidelity had not responded, the Mansoor Family filed suit in state court three months later. Fidelity then removed the case to this Court. The parties now have completed discovery.

Fidelity moved for summary judgment on two bases: (1) the life insurance application giving rise to the suit is void due to material misrepresentations about Anthony's employment and income; and (2) the bad faith claim must be dismissed because Fidelity had an "arguable or legitimate" basis for believing that Anthony died by suicide. Fidelity also mounted a challenge to the "standing" of each plaintiff besides Brie.

After full briefing and the submission of dozens of exhibits, this Court further allowed a sur-reply brief from the Mansoor Family, held extended oral argument, and accepted post-hearing briefs. This matter now stands ripe for ruling.

## II.    DISCUSSION

### A. Diversity Jurisdiction

Before addressing the motion for summary judgment, this Court first looks to whether it may hear this matter. "[F]ederal courts are courts of limited jurisdiction, having only the authority endowed by the Constitution and that conferred by Congress." *Halmekangas v. State Farm Fire & Cas. Co.*, 603 F.3d 290, 292 (5th Cir. 2010) (internal quotations omitted); *see also* U.S. CONST. art. 3, § 2. "If [a federal] court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "A federal district court may exercise original jurisdiction over any civil action that either satisfies diversity requirements[,] or that arises under the federal constitution, statutes, or treaties—commonly referred to as 'federal question' jurisdiction." *Energy Mgmt. Servs., LLC v. City of Alexandria*, 739 F.3d 255, 258–59 (5th Cir. 2014) (citing 28 U.S.C. §§ 1331, 1332, 1369).

As to "diversity" jurisdiction, "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different States." 28 U.S.C. § 1332(a). Diversity jurisdiction requires "complete diversity"—that is, "all persons on one side of the controversy [must] be citizens of different states than all persons on the other side." *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008) (quoting *Harrison v. Prather*, 404 F.2d 267, 272 (5th Cir. 1968)). "[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business[.]" 28 U.S.C. § 1332(c)(1).

In its Notice of Removal, Fidelity pleads that each of the Mansoor Family plaintiffs resides in and is a "citizen of the State of Mississippi." ECF No. 1 at 2 (citing the Mansoor Family's complaint). Mary Kate Mansoor apparently lived with her parents in Mississippi in the months prior to her father's death. *See* ECF No. 65-1 at 242.

Fidelity pleads that it is a "life insurance company" domiciled in the State of Illinois and with its principal place of business in the State of Illinois. *Id.*; *see also* ECF No. 6 at 3 (Fidelity's answer) (admitting that Fidelity is "a foreign corporation"). Fidelity adds that the amount in controversy exceeds $75,000 (exclusive of interests and costs) because the Mansoor Family seek $500,000 in contractual benefits and millions in extracontractual damages. *Id.*

## B. Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, courts shall grant a motion for summary judgment as to a claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." If "a reasonable jury could return a verdict for the nonmoving party[,]" the dispute is genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts view "the evidence in the light most favorable to the nonmoving party." *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 697 (5th Cir. 2024).

In evaluating a motion for summary judgment, "courts may not 'evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes.'" *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)). These matters are left for the factfinder (usually a jury) at trial. "The sole question is whether a 'reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor.'" *Id.*

1.    <u>Material Misrepresentations</u>

Fidelity moves for summary judgment on all of the Mansoor Family's claims because Fidelity contends that the life insurance policy the Decedent submitted to obtain the coverage at issue in this suit is "void due to material misrepresentations in the application."  ECF No. 66 at 2.

In *Fidelity Mutual Life Insurance Co. v. Miazza*, the Mississippi Supreme Court extended to contracts for insurance the hoary and "universal rule that any contract induced by misrepresentation or concealment of material facts may be avoided by the party injuriously affected thereby." 46 So. 817, 819 (Miss. 1908).  The Mississippi Supreme Court reasoned that, "[i]f the applicant for insurance undertakes to make a positive statement of a fact, if it be material to the risk, such fact must be true." *Id.*[4]

The United States Court of Appeals for the Fifth Circuit, interpreting Mississippi law, has clarified that voidness for material misrepresentation is an affirmative defense.  *State Farm Fire & Cas. Co. v. Flowers*, 854 F.3d 842, 844 (5th Cir. 2017).  "An insurer seeking to void an insurance contract based on a material misrepresentation" carries the burden to "establish the existence of the factual misstatement and its materiality by clear and convincing evidence."[5]  *Id.* (citing *Brewster v. Bubba Oustalet, Inc.*, 231 So. 2d 189 (Miss. 1970)).

---

[4] *See also* Miss. Code. Ann. § 83-9-11(3) (West) ("The falsity of any statement in the application for any policy covered by [Mississippi laws on accident, health, and Medicare Supplement insurance] may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer.").

[5] In Mississippi, "clear and convincing evidence is:"

> [t]hat weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact-finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Catlett v. Catlett*, 358 So. 3d 366, 375 (¶43) (Miss. Ct. App. 2023) (quoting *Massey v. Lambert*, 84 So. 3d 846, 848 (¶11) (Miss. Ct. App. 2012)).  It requires greater proof than the "preponderance-

Summary judgment on the defense of material misrepresentation is inappropriate where the beneficiaries have "presented particularized, probative evidence to the contrary" which "raises a genuine issue of fact." *Carroll*, 166 F.3d at 807. Deposition testimony which "elicits the presence of arguable factual contradictions," as summary judgment evidence, should not be "discounted" by the court—the duty of "test[ing this evidence] for credibility" lies with the jury. *Id.* at 808. The court should make its determination informed "by the knowledge that [the insurer], not the [b]eneficiaries, must meet the heightened clear and convincing burden of proof." *Id.* at 807.

 *i. Falsity*

To prevail on its material misrepresentation defense, Fidelity first must prove that "the applications must contain answers that are false, incomplete, or misleading." *Carrol v. Metro. Ins. & Annuity Co.*, 166 F.3d 802, 805 (5th Cir. 1999).

Fidelity alleges that the Decedent provided false information in response to inquiries in his application for the life insurance policy at issue in this case. Specifically, Fidelity points to the following answers that the Decedent provided on September 21, 2017, in a section entitled "Questions to the Proposed Insured:"



ECF No. 65-1 at 46. Fidelity argues that the Decedent misrepresented his salary and employment information. The Decedent averred to be employed by Security Holdings as "president of the board," making $175,000 in annual salary. Fidelity argues that the Decedent was not employed,

---

of-the-evidence standard,'" … which is that 'the fact to be proved is more probable than not,'" but "less than the formidable beyond-a-reasonable-doubt standard" utilized in criminal prosecutions. *Id.* (quoting *Gardner v. Wilkinson*, 643 F.2d 1135, 1137 (5th Cir. 1981).

having been fired just three weeks previously, and that, even prior to that, his employer was Action Auto, from whom he earned a $124,000 salary as an inventory manager.

This Court finds that Fidelity has not established, as a matter of law, that the Decedent's representations were not substantially true—and record evidence raises genuine disputes of material fact on that issue.

**Termination on September 1, 2017.** First, this Court looks at whether Fidelity has established that the Decedent had been terminated prior to September 21, 2017 (when he applied for the policy). Fidelity refers this Court to William Alias' deposition testimony, in which Alias claims he fired the Decedent by phone on September 1, 2017. ECF No. 66 at 13 n.13 (citing Alias Depo. 21:21–25). Alias also reported, in a written statement to the Mississippi Bureau of Investigation (as they investigated the Decedent's passing), that he had fired the Decedent on "approximately" September 1. ECF No. 65-1 at 132. A "few days later," Alias claims, he "emailed [the Decedent] a release." *Id.* Alias also texted the Decedent on September 5, 2017, stating, "I want to send you a release that we can discuss next Monday when we meet," to which the Decedent immediately responded with his email address. ECF No. 65-1 at 136. Fidelity also offers a printout of the payroll records referenced in the deposition, which records indeed list a "Termination Date" of "09/01/2017." ECF No. 65-1 at 106.

Regarding the call, relevant portions from the deposition are copied below, with "Q" meaning the questioning attorney is speaking and "A" meaning the deponent, William Alias is speaking:

> Q. Okay. Did Action Auto have an employment file for Mr. Mansoor?
>
> A. I believe that we did, but there's very little in it.
>
> Q. Okay. Was it your decision to terminate Mr. Mansoor?

A. Yes.

Q. And did you have the conversation with him?

A. Yes.[6]

Q. Were there any others who participated in that conversation?

A. No.

Q. I'm going to show you employment records that we received from Action Auto later. I can represent to you that they indicate the termination date was September 1, 2017. Does that sound correct to you?

A. Yes.

Q. And was there a meeting with Mr. Mansoor on that date?

A. There was a telephone call that -- I believe that there was a telephone call, because I feel like I remember driving to our hunting place again and talking to him about it.

Q. Okay. And as best as you can remember, what did you say and what did he say?

A. Well, the whole -- so I don't, you know, I think this is, like, six years ago, so it's hard to remember the exact conversation. And the whole situation was just awkward for both of us, I'm sure, because we had been friends for a while. But what I recall about it was that it actually was a, you know, polite conversation on both ends. He

---

[6] This Court received an objection by the Mansoor Family that Alias' testimony regarding the supposed termination by phone is "inadmissible hearsay." ECF No. 71 at 9–10.

The Rules of Evidence define "hearsay" a "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A statement's offering for its asserted truth is an important element, as a "statement offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay." *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009).

This Court finds that this statement has not been offered to show whether Alias fired the Decedent (a fact whose eventual occurrence the Mansoor Family cannot reasonably dispute), but *when* Alias fired him—and, as Fidelity contends, "to demonstrate [the Decedent's] knowledge" of his firing. This Court finds that Fidelity uses the statement not for its truth, but to show "the bare fact that it was said" (for its effect). The statement, therefore, is more akin to a verbal act than a hearsay declaration. The objection is **overruled.**

was, as I remember, pretty understanding about it. I mean, I think he had a pretty good idea that it wasn't going well, and at least that was a sense that I got. And so we parted ways.

Q. And was that a termination for cause?

A. You know, I don't remember that.

Q. Was it the --

A. And let me say one other thing. I don't -- and again, for me, I mean, we've had thousands of people work for us over the last 28 years. This one was just different because of our friendship.

Q. Okay.

A. So it wasn't handled, you know, really like other terminations within our company would have been handled.

Q. Understood. At the end of the phone call, was it understood that Mr. Mansoor did not have any further -- that was his last day, for lack of a better phrase?

A. Correct.

Q. So it was over as of then?

A. Yes.

ECF No. 65-1 at 117 (Alias Depo. 19:25–22:2). Later in the deposition, the date of the termination comes up again, and Alias again apparently relies on the records:

Q. … And during our break you were able to get copies of exhibits that we've been using in this case so far. The first one I would like to ask you about is D12. If you could pull that document up and just spend a moment, it's pretty short, just take a look at it.

A. Okay.

Q. Do you recognize that document?

A. No.

Q. Okay. I can represent this is a document that we received from your attorney in response to a subpoena with the understanding that these are payroll records from Action Auto. Does that look accurate? That seem correct?

A. Yeah, I mean, as far as I remember, it looks correct to me.

Q. Okay. And on the third page of that document it indicates that the position start date for Mr. Mansoor was March 28, 2016. Do you see that?

A. Yes.

Q. Does that seem correct to you? I know you probably don't have a personal memory of the exact date, but that seems -- you have no reason to think that that's incorrect?

A. That's right.

Q. Okay.

A. Yes, I agree with you.

Q. And it also says that the termination date was September 1, 2017? You're nodding your head.

A. Well, hang on, I'm trying to find it.

Q. Okay. It's under the big bold, that says status.

A. Yes. Correct.

Q. And, again, I think you acknowledged before that that sounded correct. You have no reason to believe that that's not correct?

A. That's right.

ECF No. 65-1 at 120 (Alias Depo. 35:9–36:23).

Alias texted the Decedent on September 1, 2017, that he would call the Decedent that afternoon. ECF No. 65-1 at 136. These text messages do not identify the purpose for the call, nor are there any follow up messages confirming what was discussed or referencing the supposed termination of September 1. *Id.* Indeed, Alias next texted the Decedent, referencing a meeting planned for the upcoming Monday, which Alias then rescheduled on that Sunday. *Id.* According to Alias' written statement to the Mississippi Bureau of Investigation, he met with the Decedent

in person, at which the two discussed Alias continuing to "pay him" for an undetermined period. ECF No. 65-1 at 132.

Regarding the employment records, when it was the Mansoor Family's lawyer's turn to examine Alias, he asked Alias whether the payroll document was "the employment file for Mr. Mansoor" mentioned earlier.  ECF No. 65-1 at 124 (53:18–19).  Alias "believe[d] so" but admitted he had "never looked at [the] company's employment files."  *Id.* (53:20–21).  That was a Linda Wyndahm's responsibility—Wyndahm, who was "in charge of … human resources," had provided the payroll document to Alias so he could turn it over to Fidelity's attorneys, and Wyndahm was the person responsible for "updating these files." *Id.* at 125 (54:1–21).  Alias could not say whether the Decedent "ever had an opportunity to review" this file.  *Id.* (54:22–24).  It is unclear who entered into the payroll records that September 1 was the Decedent's termination date (or when that person entered it).  This Court also notes that the system lists the "Termination Reason" as "Mutual Agreement" and states that the Decedent was eligible for rehire.  *Id.* at 106.

Regarding the release that Alias supposedly emailed to the Decedent a few days later, Alias admitted that he did not "believe [they] ever actually executed the release."  ECF No. 65-1 at 125 (56:1–4).  The emails that Alias provided to Fidelity's counsel also do not contain this alleged email from early September.  *See* ECF No. 65-1 at 142–48 (in the earliest email, dated September 27, 2017, the Decedent makes reference to "hoping to land a 3-4 month severance").  The text that Alias sent to the Decedent about wanting to send him "a release" does not identify the content of this "release" nor the purpose of the planned meeting for the following Monday.  ECF No. 65-1 at 136.  Alias, indeed, testified that he "actually" did not recall sending the Decedent the email with the release, despite his earlier testimony and the statement he had given to the Mississippi Bureau

of Investigation.[7]  ECF No. 65-1 at 125 (56:5–8).  Instead, he alleged that the termination was "all verbal," and Alias never asked the Decedent to "sign any document that he acknowledged he was being terminated."  *Id.* (54:25–8).

Regarding the Mississippi Bureau of Investigation inquiry, Lieutenant Sullivant wrote in his report that he met with Michael Lindsey (who is listed as the Decedent's supervisor on the payroll documents) and Alias a few months after the Decedent's death.  ECF No. 65-1 at 64 (Sullivant Rep. p.6).[8]  Supposedly, "Lindsey told [him] they terminated [the Decedent] on 09-01-2017 *for stealing from their car lot*."  *Id.* at 65 (Sullivant Rep. p.7) (emphasis added).  This contradicts Alias' later statement to the Mississippi Bureau of Investigation, wherein he stated that he fired the Decedent, "for Cause,"[9] because he "was doing a poor job, had misl[ed] us several times, and had not moved to Oxford."  ECF No. 65-1 at 132.  It also contradicts Alias' deposition testimony, where he agreed that "[a]t the time [of] … the termination conversation … [Alias] did not have any suspicions that [the Decedent] had been embezzling from Action Auto."  ECF No. 65-1 at 117 (24:4–9).

It must be noted that Alias is the one who claims the Decedent "confessed to [him] that [the Decedent] had been selling vehicles that belonged to Action Auto and pocketing the money."

---

[7] This Court acknowledges that the statement to the Mississippi Bureau of Investigation arguably could be used at trial as a prior consistent statement or as a recorded recollection (subject to objection and proper foundation), but these evidentiary purposes would be for the benefit of the jury in evaluating Alias' credibility, rather than to compel this Court to uncritically accept summary judgment evidence as creating undisputed fact.  *See* Fed. R. Evid. 801(d)(1)(B); Fed. R. Evid. 803(5).

[8] *But see* ECF No. 65-1 at 76 (Sullivant Depo. 28:6–17) (Alias and a "Mr. Williams" "advised [Lieutenant Sullivant] that they had terminated his employment around September, and then later after that, that's when they realized that Mr. Mansoor had embezzled a lot of money from them.").

[9] *But see* ECF No. 65-1 at 116 (Alias Depo. 21:9–10) (Alias stating he did not remember whether the termination was "for cause").

ECF No. 65-1 at 115 (Alias Depo. 16:21–17:4).  Alias claims that this is how he learned about the alleged embezzlement.  *Id.* at 117 (24:17–19).  Alias would report that this occurred on September 26, 2017.  *See id.* at 132.  That same day, Alias and the Decedent each talked with a counselor, characterizing their issue as an "unsettled debt" that the Decedent owed Alias regarding the cars. *Id.* at 150 (Caldwell Letter).

By the end of October, Security Holdings, LLC had filed an insurance claim for loss.  *See id.* at 153 (Travelers Insurance Letter).  Just a few days prior to the Decedent's death, Alias had filled out a Proof of Loss form for this claim, on Security Holdings, LLC's behalf.  *Id.* at 155.  In the form, Alias stated that the company discovered losses due to the Decedent's "Employee Dishonesty or Employee Theft" on September 20, 2017.  *Id.*  Alias, here too, averred that he had fired the Decedent on September 1, but claimed the company discovered the losses through an internal investigation—making no mention of the supposed confession or the payment plan he was negotiating with the Decedent.  *Compare id.* at 159 (Proof of Loss Form, Ex. B), *with id.* at 139 (text messages).  By late November, Alias and the Action Auto team also had pressed charges against the Decedent.  *See id.* at 168 (Oxford P.D. Report).

In fact, Michael Lindsay had reported to authorities that the most recent incident (regarding the Decedent supposedly unlawfully selling Action Auto's vehicles) was September 28, 2017, nearly a month after his alleged termination.  *See* ECF No. 65-1 at 127 (Alias Depo. 64:13–18). Alias claimed he did not know whether that meant the Decedent "was still selling cars for Action Auto on September 28, 2017," or whether there was some other explanation.  *Id.* (65:3–11).

For her part, Ginny Mansoor, the Decedent's wife, thought her husband had been fired in "October."  ECF No. 65-1 at 241 (Virginia Mansoor Depo. 33:17–23).  She explained that the family had "stayed in the company condo in Oxford during the month of September," but that said

condo "was no longer available" to them in October. *Id.* at 241–42 (33:24–13), 252 (76:10–21). For that reason, she did not "believe" that it was "possible" the Decedent had been fired in early September but did not tell her. *Id.* at 251–52 (73:25–12). She also explained that the Decedent "maintained his regular routine," regarding his work schedule, "throughout September." *Id.* at 242 (35:2–19). She claimed that she first learned that the Decedent had been fired in October or November through the Decedent and that she believed she "learned about it roughly contemporaneous" to the firing. *Id.* (37:2–9) (availing herself of spousal communications privilege, she refused to testify exactly what the Decedent told her). Alias, when asked about this condominium during his deposition, recalled that the company "had a place for [the Decedent] to stay when he was in Oxford." *Id.* at 117 (Alias Depo. 23:5–25).

Too many questions plague the timeline of Action Auto's firing of the Decedent for this matter to be resolved as a matter of law on summary judgment. This Court is not permitted, at this stage, to judge the credibility of Alias and Ginny Mansoor, or to resolve the factual disputes underlying their respective testimonies. *Guzman*, 18 F.4th at 160. These tasks lie in the province of an empaneled jury.

**Salary.**  Next, regardless of whether he was still employed,[10] this Court looks to whether Fidelity has established that the Decedent's listing of his "annual income" as $175,000 was a material misrepresentation. Fidelity points out that the Decedent's annual salary from Action Auto was $124,000. *See also* ECF No. 65-1 at 106 (Payroll Records) (listing the Decedent's annual salary as $120,000 as of January 2017 and $123.600 as of March 2017).

---

[10] This Court notes, for thoroughness, that, even according to Alias, he and the Decedent were in the process of negotiating period of severance pay in September 2017. *See* ECF No. 65-1 at 132 (Alias Statement to the Mississippi Bureau of Investigation).

Alias, in his deposition, "assum[ed]" that Action Auto "probably did" pay the Decedent "commissions," likely "based upon his purchasing volume." ECF No. 65-1 at 126 (Alias Depo. 60:3–12). He could not remember if the Decedent earned "bonuses." *Id.* This Court notes that the Decedent asked Alias, by email, "about the $3000 bonus that [he hadn't] receive[d] for [A]ugust." *Id.* at 145. Whether this was truly a bonus the Decedent was owed, or whether this was merely a "Hail Mary" attempt to get some extra money, is unknown; but this Court notes that Alias did not contradict this statement in his responsive email. *Id.* Taking into account that Alias has remarked that the Decedent had performed poorly at work prior to his firing, a factfinder reasonably could infer that $3,000 was a lower-than-average monthly bonus or commission. *See id.* at 115 (Alias Depo. 16:5–8) ("at the time [the Decedent] was terminated, the concern was that he was not purchasing enough vehicles that could then be resold to the public"). A less-than $5,000 monthly bonus or commission, over the course of twelve months, would suffice to account for the $51,000 discrepancy between the Decedent's salary and the "annual income" he listed in the insurance application.[11] Without providing this Court a record of the specific amounts that Action

---

[11] This Court notes that, if the Decedent's representation was partially based on income outside of his regular salary, the Decedent may have been estimating. Indeed, estimation may be the only true way to construe Fidelity's requirement for an applicant to state his "annual income." *See Life & Cas. Ins. Co. of Tenn. v. Kelly*, 32 So. 2d 120, 122 (Miss. 1947) (it is relevant how "the applicant would naturally have understood the questions," construing the application "most strongly against the insurer").

The Mississippi Supreme Court also has clarified that a "representation needs only to be substantially true, and if it is not material to the risk, in the absence of fraud, its falsity will not invalidate the policy." *Kelly*, 32 So. 2d 120, 122 (Miss. 1947) (quoting *Citizens' National Life Ins. Co. v. Swords*, 68 So. 920, 920 (Miss. 1915)). In its line of material misrepresentation cases, the Mississippi Supreme Court does not define what it means for a representation to be "substantially true," other than an implication that it requires less veracity than something warranted to be "literally true." *Id.*[11]

Because Fidelity cannot, at this point, show that this figure is not "literally true" as a matter of law, this Court finds it unnecessary to guess at what the Mississippi Supreme Court means by substantial truth, but expects the parties may need to brief this issue at a future date.

Auto paid the decedent outside his salary, nor ruling out other sources of income, Fidelity has not established as a matter of law that the Decedent misrepresented his "annual income."

**Position and Job Title.**  While not pertinent to its initial motion, Fidelity also alleges in its post-hearing brief that the Decedent misrepresented his employer as "Security Holdings" and his position as "[president] of the board."  Fidelity Letter Br. p.2.  At oral argument, Fidelity had similarly argued that the Decedent "made up some other name and some other position" to accompany his misrepresented income.

The record evidence shows that the Decedent did not "make up" Security Holdings.  Alias testified that Security Holdings was "a holding company."  ECF No. 65-1 at 129 (Alias Depo. 71:16–22).  Alias explained that he did not "believe" that the Decedent ever was "employed by Security Holdings," but acknowledged that for "a period of time," the Decedent "worked with [their] debt buying business" prior to his "starting with Action Auto."  *Id.*  Alias, nonetheless, agreed that, once hired by Action Auto, the Decedent was not an employee of Security Holdings. *Id.*  This Court notes that this statement is largely conclusory, and Alias admits he delegates human resources services for his companies.

Immediately after this discussion, Alias testified that "Action Auto submit[ted] a claim for" "theft insurance."  *Id.* (72:24–73:2) (emphasis added).  Alias, as "owner," signed a proof of loss statement for a theft insurance claim in this record, on behalf of "Security Holdings, LLC."  *Id.* at 155.  Alias claimed loss from the Decedent's alleged "Employee Dishonesty or Employee Theft" while "employed as Vehicle Buyer for Action Auto, LLC."  *Id.*  Alias therein notes that Action Auto, LLC is a "subsidiary of Security Holdings, LLC."  *Id.* at 159.  Alias testified that "EquiPro," the holding company which replaced Security Holdings, handles "human resources for the various companies," including Action Auto.  *Id.* at 126 (Alias Depo. 58:16–59:1), 129 (71:18–72:9).

Ginny Mansoor, the Decedent's wife "understood" her husband to work for Security Holdings, which she understood was Alias' company that owned Action Auto.  ECF No. 65-1 at 240 (Virginia Mansoor Depo. 26:5–17).  Ultimately, she characterized the Decedent as "work[ing] for William," and that "Security Holdings" is the company she was "most familiar with," with Action Auto just being "one of them."  *Id.* at 239 (23:12–24:21).

Ginny Mansoor did not know whether her husband was "president of the board" of Security Holdings, however.  ECF No. 65-1 at 260 (107:17–108:23).  The record is unclear as to the Decedent's true job title.  In the proof of loss statement mentioned earlier, Alias noted the Decedent as "Vehicle Buyer for Action Auto, LLC."  *Id.* at 155.  The payroll documents list the Decedent as "MGT," a common abbreviation for "Management."  *Id.* at 106 (Payroll Records).  Indeed, when asked at his deposition what his position was at Action Auto, Alias responded: "I guess you could say I was the President or the CEO, to be honest with you I've always hated titles, so we've never really had them."  *Id.* at 114 (Alias Depo. 11:17–12:3).

Given all of these factors complicating who could fairly be called the Decedent's employer and what could fairly be designated his job title, this Court is unprepared to rule as a matter of law that the Decedent misrepresented these matters on his insurance application.

### ii.   *Materiality*

Having already found that summary judgment fails on the "misrepresentation" element, this Court only briefly addresses the "materiality" element as an alternative basis for its decision.

Because "[c]ourts are not given to avoiding contracts for misrepresentations of an immaterial nature," the Mississippi Supreme Court has long held that an actionable "misstatement" must be "about a material matter."  *Miazza*, 46 So. at 819.  That is, the court must look at whether, "if there had been a full disclosure" as to the representation at issue, "it might reasonably have influenced the company not to make the contract of insurance."  *Id.*

Fidelity requests that this Court employ the strict materiality standard annunciated by a Fifth Circuit panel in *Carroll*, ECF No. 66 at 12; there, the panel explained that "a fact is material if it might have led a prudent insurer to decline the risk, accept the risk only for an increased premium, or otherwise refuse to issue the exact policy requested by the applicant." *Carroll*, 166 F.3d at 805.

Fidelity argues that the Decedent's supposed misrepresentations at issue were material. Fidelity submits to this Court a declaration from Fidelity's chief underwriter, Jeannine DuPlessis, along with its underwriting guidelines (filed as restricted from the public).

As an initial matter, neither DuPlessis nor Fidelity attempts to argue that the Decedent's designation of his employer as "Security Holdings" or his job as "president of the board" are material, or that these factors are relevant to the determination of Fidelity's choice to contract with him for insurance.  Indeed, reviewing Fidelity's guidelines as to which listed occupations should "be questioned" or "are not acceptable," this Court does not see why the underwriter's eyebrows would raise if the Decedent had listed "Action Auto" as his employer or "Vehicle Buyer."[12]  ECF No. 69 at 21 (underwriting guide, filed as restricted).  Therefore, this Court finds that Fidelity has not met its burden on summary judgment as to the materiality of those representations, even if they were false.   Duplessis instead opined that, had Fidelity "been aware of" the alleged misrepresentations as to the Decedent's employment and salary status, "it would have declined to issue the policy."  ECF No. 65-2 at 6 (DuPlessis Decl. ¶24).

---

[12] Obviously, if the Decedent had listed himself as "unemployed" for occupation or "no company," that could cause the underwriter pause; but this possibility is addressed in the discussion of the putative materiality of the Decedent's representations as to employment status and income.  ECF No. 69 at 21 (Fidelity Underwriting Guidelines).

DuPlessis noted that the "touchstone of [Fidelity's] financial underwriting is the insured's income." *Id.* at 4 (¶11). DuPlessis "bec[a]me familiar with the application and underwriting file materials relating to" the Decedent's policy. *Id.* (¶4). She explained that "the policy was issued based on [the Decedent's] stated earned income of $175,000, which … would have qualified him for $3.5 million in coverage." *Id.* (¶18). This is because a "person of [the Decedent's] age (i.e., 47 in 2017) would be eligible for coverage up to twenty times his earned income, or three times his unearned income." *Id.* (¶13). Therefore, "[e]ven after [Fidelity reduced] his eligibility by $500,000 to account for the existing policy of life insurance that he disclosed on the application, [the Decedent] more than qualified for the [$500,000] policy sought." *Id.* (¶18). Duplessis was "advised that [the Decedent], in fact, was not employed when he applied for the policy" and, thus, "could not [have] qualif[ied] for insurance based [the] earned income" multiplier. *Id.* (¶19). Even if the Decedent "continued to receive his salary [of $124,000] in the form of severance," Fidelity would consider it "unearned income." *Id.* (¶20). In that scenario, he would have only qualified for $372,000, which would have been extinguished by reducing his eligibility by his other $500,000 policy. *Id.* (¶¶21–22).

This Court first looks at whether, if the Decedent was truly still employed with Alias' company, but he incorrectly listed his income as $175,000, that would be a material misrepresentation. Based on DuPlessis' declaration, it would not. A salary of $123,600, multiplied by an "earned income" factor of twenty, equals nearly $1.5 million in eligibility. Even reduced by $500,000 from another policy, this still could result in the policy the Decedent obtained.

Next, this Court considers whether the Decedent misrepresenting his employment status and salary would be material, assuming a putative termination date of September 1—prior to the September 21 application date. There indeed are inclinations in the record that, just as Fidelity

and DuPlessis assume in their hypothetical: it looked like the Decedent may have continued to receive his salary as severance for an indeterminate amount of time (somewhere more than one month, but less than twelve months). *See* ECF No. 65-1 at 132 (Alias Statement to the Mississippi Bureau of Investigation).

As articulated by the Fifth Circuit, materiality is judged by an objective standard: whether more truthful information would have "led *a prudent insurer* to … refuse to issue the exact policy requested by the applicant." *Carroll*, 166 F.3d at 805 (emphasis added). This Court notes that DuPlessis only opines as to whether Fidelity would have declined to issue the policy, which is inherently a self-serving, hindsight analysis, rather than offering an expert opinion as to what a prudent insurer would do (and why). DuPlessis, nonetheless, provides a logical explanation for her opinion as to Fidelity's likely response.

The Mansoor Family, however, points out two complicating items from the underwriting guidelines upon which DuPlessis bases her opinion: First, the Mansoor Family contends that the underwriting guidelines are silent on—and thus, provide no support for—DuPlessis' premise that "the applicant's eligibility would be *reduced* by the face value amount of any existing policies." ECF No. 65-2 at 4 (DuPlessis Decl. ¶16). DuPlessis does not explain whether this is an unwritten Fidelity policy, or an industry standard, or simply a judgment call. Additionally, while DuPlessis hinges her opinions primarily on the multiplicative factors (used for different age ranges, with respect to earned and unearned income), she does not address a piece of advice directly below the guidelines for these factors. It states: "As always, underwriter discretion (allowing more or less coverage) may be applied provided documented justification is properly added to the file using an 'exception' note." ECF No. 69 at 21 (Fidelity Underwriting Guidelines). Without the reduction of $500,000 from the Decedent's other policy, and with a marginal proportional increase in

coverage due to putative underwriter discretion, the Decedent apparently could have obtained the same coverage he requested here. A factfinder could reasonably determine, upon trial evidence, that a prudent insurer would have still entered the same policy with Decedent. Fidelity, then, has not established, as a matter of law, the materiality of the supposed misrepresentations.

      *iii.*    *Scienter / Fraud*

      Throughout briefing, the primary thrust behind the Mansoor Family's rebuttal to the material misrepresentation defense has been a scienter argument. The Mansoor family points out that the "Important Notice Regarding [the Decedent's] Application for Insurance," warns that "[k]nowlingly providing false information, or omitting information, could result in our recission of your policy or denial of a claim." ECF No. 65-1 at 54. Fidelity also, on the "Declaration" page, instructed the Decedent to agree his statements were "complete and true to the best of [his] knowledge and belief." *Id.* at 59. From these, and other, provisions, the Mansoor Family opines that Fidelity, in forming this policy, "was concerned with fraudulent statements, not merely negligent statements." ECF No. 71 at 9. The Mansoor Family then plows forward with an argument that (1) whether the Decedent "knew, at the time he" applied for the policy, that he had been fired, and (2) whether the Decedent "knowingly misrepresented his income," are subject to genuine issues of material fact. *Id.* at 10–11.

      Fidelity counters that "an insurer may void a policy based on material misrepresentations in the application regardless of whether the applicant intended to deceive." ECF No. 74 at 2. Fidelity also protests the Mansoor Family's contention that Fidelity "incorporated a 'scienter' requirement into [its] policy" at all. *Id.* Fidelity also argues that, even if there were such a scienter requirement, their evidence would show that the Decedent intended to deceive.

      In *Miazza*, the Mississippi Supreme Court explained that the representation "must be [true] in fact," and that the applicant "believes it true" is "not sufficient." 46 So. at 819. A Fifth Circuit

panel in *Dukes v. Southern Carolina Insurance, Co.* interpreted *Miazza* "unequivocally" to state that "the intent of the insured is irrelevant" and that the "sole consideration is whether there has … been a material misrepresentation of fact." 770 F.2d 545, 549 (5th Cir. 1985). Another Fifth Circuit panel recently rejected an argument that material misrepresentation required the applicant to have "willfully misrepresented" a material fact—and that summary judgment was inappropriate where "there [was] a genuine issue of fact as to whether [the applicant] reasonably, and in good faith, believed" his misrepresentations. *State Farm Fire & Cas. Co. v. Flowers*, 854 F.3d 842, 844–45 (5th Cir. 2017) (internal quotations omitted). The panel reasoned that "whether the misrepresentation was intentional, negligent, or the result of mistake or oversight is of no consequence." *Id.* (citing federal and Mississippi cases).

The district court, which the *Dukes* panel affirmed, had reasoned that the intent of the misstatement is "unimportant," because the parties to the insurance contract would have "entered into this contract under a mistake of fact," where "[h]ad that mistake been shown the insurance company would not have written the policy." *Dukes v. S.C. Ins. Co.*, 590 F. Supp. 1166, 1169 (S.D. Miss. 1984) (Barbour, J.) (this following from a "general principal of contract law" which the special nature of insurance contracts does not alter). The court identified "some cases which have interjected the element of intent," but noted that "this ha[d] not been in any way uniformly applied." *Id.* (citing *Gardner v. Wilkinson*, 643 F.2d 1135, 1136 n.3 (5th Cir.1981); *Apperson v. United States Fidelity and Guaranty Co.*, 318 F.2d 438, 441 (5th Cir.1963)).[13]

---

[13] Having reviewed *Gardner*, this Court does not see where the "element of intent" was interjected as to material misrepresentations. 643 F.2d 1135. There, the insurer contended the applicant misrepresented his ownership of a home, which he had previously deeded to his son. *Id.* at 1137. The panel determined, partly based on the father's and son's testimonies that they nonetheless "considered the father to be the true owner," that the jury's verdict was supported by substantial evidence. *Id.* Thus, the panel did not hold that the applicant's scienter defeated a material

In *Life and Casualty Insurance Co. of Tennessee v. Kelly*, the Mississippi Supreme Court interpreted its precedent as leaving "open for proof the question of good faith and fraud," with respect to "statements made by an applicant which are representations and not warranties."  32 So. 2d 120, 122 (Miss. 1947) (quoting *Nat'l Life & Acc. Ins. Co. v. Green*, 3 So. 2d 812, 813 (Miss. 1941)).  That court, "under the proof," opined that "the answers in question were in fact true in the sense that the applicant would naturally have understood the questions;" or "[a]t least they were made without any conscious knowledge on the part of the applicant that he had heart trouble in the ordinary acceptation of that term."  *Id.* (construing the policy "most strongly against the insurer").  The *Kelly* court held *Miazza* not to control its analysis.  *Id.*

In *Coffey v. Standard Life Insurance Co. of the South*, the Mississippi Supreme Court cited *Kelly* after finding, in route to affirming voidance of a policy, that the insured's statements "were untrue, and the insured must have known they were not true."  120 So. 2d 143, 149 (Miss. 1960) (also quoting, before even *Miazza*—a United States Supreme Court opinion which examined Floridian contracts, and which characterized material misrepresentations as actionable where "known to be untrue by assured when made").

*Kelly* seemingly throws a wrench into the gears.  At least two district courts have characterized *Kelly* to resolve its conflict with the more commonly cited rule finding scienter

---

representation defense, but rather that the subjective understandings of the parties involved informed whether the fact of the father's ownership indeed was a misrepresentation.

The *Apperson* panel, characterized the "general rule [as] that the *intentional* misrepresentation, by the applicant for an insurance policy, of a material fact, if relied on by the insurer, is ground for rescission[.]" 318 F.2d at 441 (emphasis added).  The panel cited a string of cases, including *Miazza* and several non-controlling cases.  *Id.* at 441 n.2.  The panel did not discuss, specifically, from where it sourced the requirement that the misrepresentation must be "intentional."  In *Apperson*, the "evidence [had] clearly established that Apperson wilfilly made false statements of material facts," and the crucial question was whether the "insurer actually and rightfully rel[ied] on" those misrepresentations.  *Id.* at 441–42.

irrelevant. In one, the court cited *Kelly* in a string-cite for the proposition that "[k]nowledge of the misrepresented condition or intent to deceive the insurer is required only where the misrepresentation is not material or where the basis for rescission is fraud." *Golden Rule Ins. Co. v. Hopkins*, 788 F. Supp. 295, 303 (S.D. Miss. 1991). This Court, though, does not see this as the rule which clearly flows from *Kelly*. In another case, the court cited *Kelly* as Mississippi's adoption of a rule wherein:

> The insurance company is also under a duty to frame questions in the application so that they will be free from misleading interpretations. When it has failed to do so, and ambiguity or doubt arises, questions and answers thereto will be construed most favorably to the insured.

*Chapman v. Safeco Ins. Co. of Am.*, 722 F. Supp. 285, 288 (N.D. Miss. 1989) (quoting 13A Appleman, Insurance Law and Practice § 7585 (1976)). This Court finds this characterization reasonable.

This Court also notes that "fraud" traditionally is presented as a defense parallel to material misrepresentation, e.g.: "A representation needs only to be substantially true, and if it is not material to the risk, *in the absence of fraud*, its falsity will not invalidate the policy." *Citizens' Nat'l Life Ins. Co. v. Swords*, 68 So. 920, 920 (Miss. 1915) (emphasis added; citations omitted). This opens questions here: If the intent of the applicant is always irrelevant (because the courts' primary inquiry should be whether, if the insurer knew the truth, it would have accepted the risk of entering into a policy with the applicant) then why would fraud matter absent a material misrepresentation?

Another question: *If* voidance due to material misrepresentation is a judicial doctrine whose precepts apply regardless of how the insurer characterizes it in the policy, as *Miazza* seems to imply; and *if* intent truly is irrelevant under that doctrine, then can the Mansoor Family's contention that Fidelity incorporated a scienter requirement into its policy actually affect this

Court's analysis?  The Mansoor Family cites to *Bradley v. Viking Insurance Co. of Wisconsin*, in which a Fifth Circuit panel seemingly adopted a definition for misrepresentations in an insurance policy, which required their falsity to be "known by [the applicant] to be false, misleading or fraudulent."  56 F.4th 1011, 1018 (5th Cir. 2023).  This adoption, however, was ultimately unnecessary for the panel to reach its holding, since it was "undisputed" that the applicant knowingly failed to disclose a material fact.  *Id.*

This Court, having already found Fidelity's defense inappropriate for summary judgment, need not resolve this question within this order.  Fidelity has not explicitly pursued a voidance theory based on "fraud"); but Fidelity has asserted that the Decedent "intended to deceive." Fidelity Letter Br. p.2.  As a precaution, this Court explicitly finds, based on its prior analysis, that Fidelity has not established fraud, and, indeed, material disputes of fact exist as to the Decedent's true intent.  This Court does so without finding that either fraudulent or innocent intent is strictly relevant to this matter, either from common-law doctrine or from Fidelity possibly incorporating an intent element by way of inclusion in its contract.

This Court, nonetheless, thought it necessary to spend some words discussing this issue.  It is sure to arise again, in the context of jury instructions regarding the elements of Fidelity's material misrepresentation defense.  This Court may need, at that time, to guess at how the Mississippi Supreme Court might rule upon the instruction.  Therefore, the parties are on notice that this Court will request more thorough briefing on this point than it already has received.

    iv.    *Post Hoc Assertion of Material Misrepresentation*

A Fifth Circuit panel recently found it needed to resolve a problem, which was that, while it found an insurer "could have voided the policy" due to material misrepresentations, it instead had "chose[n] to deny coverage" on that basis.  *Bradley*, 56 F.4th at 1019.  The *Bradley* panel, concerned that the insurer was trying to "have its cake and eat it too," questioned whether, "by not

voiding" the policy, the insurer preserved the "statutory and judicial prohibitions" of the material misrepresentation doctrine. *Id.* The panel opined that Mississippi Law was "ambig[uous]" on this point and needed to make a "reasonable legal interpretation." *Id.* Ultimately, the panel "conclude[d] that[,] if an insurer declines to exercise the greater power to void a policy, it still retains the lesser power to exercise a contractual right to deny coverage." *Id.* It so held by finding the "same concerns present" in the instance of denial as those contemplated by the Mississippi Courts in instances of voidance: that "material misrepresentations undermine insurers' ability to make proper assessment of risk and set premiums." *Id.* (citing *Jones–Smith v. Safeway Ins. Co.*, 174 So. 3d 240 (Miss. 2015)).

This Court is also confronted with a suit arising from a denial of coverage rather than a voidance of the policy. Unlike in *Bradley*, however, Fidelity denied coverage based on the Suicide Exclusion. The material misrepresentations appear to be more an afterthought, a defense raised in litigation that did not underlie the initial denial. Given *Bradley*'s consternation, this Court questions the propriety of a material misrepresentation defense in this procedural posture.

This is unlikely to be a case of Fidelity seeking to "have its cake and eat it too," since, under the Suicide Exclusion, Fidelity offered to refund the Decedent's premiums to the beneficiary; and Fidelity did note that, in denying coverage, it purported not to "waive or surrender any other rights or defenses, whether known to [it] now or learned thereafter[.]" ECF No. 65-1 at 207 (Denial Letter). On the other hand, Mississippi Law's concern that "material misrepresentations undermine insurers' ability to make proper assessment of risk and set premiums," as cited in *Bradley*, may be less applicable in this situation—where the misrepresentation concerns the Decedent's earning and employment, and there is no contention the Decedent was struggling to meet his $945 per year premiums.

The parties, thus, should examine these issues and begin preparing their legal arguments, if any exist, so that this Court can receive the necessary briefing it needs in determining the proper jury instructions.

2. <u>Bad Faith Denial</u>

Having determined that the Mansoor Family's contract claim survives summary judgment and will proceed to trial, this Court turns to whether the Mansoor Family's claim for bad faith similarly persists.[14]

In Mississippi, "claimants can bring bad faith claims against[,] and recover punitive damages from[,] insurers who refuse to pay out on a valid claim." *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 69 (5th Cir. 2014) (citing *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1098 (Miss. 1996)).  Such a "bad faith refusal claim is an 'independent tort' separable in both law and fact from the contract claim asserted by an insured under the terms of the policy." *Id.* (quoting *Spansel v. State Farm Fire & Cas. Co.*, 683 F. Supp. 2d 444, 447 (S.D. Miss. 2010) (Guirola, J.)).

The Mississippi Supreme Court has "set out the two-step analysis for assessing punitive damages for a bad faith insurance claim as follows:"

> The issue of punitive damages should not be submitted to the jury unless the trial court determines that there are jury issues with regard to whether:
>
>> 1. The insurer lacked an arguable or legitimate basis for denying the claim, and

---

[14] Preliminarily, this Court considers whether Fidelity waived or forfeited this ground of summary judgment.  While it constituted one of Fidelity's two enumerated grounds in its original motion and brief, Fidelity does not directly address the bad faith claim in its reply brief or supplemental brief.  That said, this Court does not find that Fidelity waived or forfeited this ground for two main reasons: First, Fidelity continued to maintain this ground at oral argument.  Secondly, the Mansoor Family did not raise, in its opposition, any arguments or evidence so novel as to require rebuttal above what Fidelity already headed off in its initial motion.

> 2. The insurer committed a [willful] or malicious wrong, or acted with gross and reckless disregard for the insured's rights.

*Jenkins v. Ohio Cas. Ins. Co.*, 794 So. 2d 228, 232–33 (Miss. 2001).  Even if "an insurer's decision to deny benefits may ultimately turn out to be incorrect … punitive damages will not lie if the carrier has a reasonable cause for such denial" and acted in "good faith."  *Willis v. Allstate Ins. Co.*, No. 2:13-CV-60-KS-MTP, 2014 WL 5514160, at *9 (S.D. Miss. Oct. 31, 2014) (quoting *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (Miss. 2003)).

These are "question[s] of law," and the trial court may dismiss the claim for punitive damages "at the summary judgment stage where the insurance company presents an adequate prima facie showing of a reasonably arguable basis for denial so as to preclude punitive damages." *James*, 743 F.3d at 70 (quoting *Caldwell*, 686 So. 2d at 1097 n.1).  The insurer's burden here is "low," *id.*; the Mississippi Supreme Court has defined "arguable reason … as nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to the heightened level of an independent tort."  686 So. 2d at 1096 (quoting *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 293 (Miss.1992) (cleaned up)).  Once the insurer articulates this, the claimant "bears the burden to demonstrate that [the insurer] had no arguable reason for denying coverage."  *Id.* at 1097.  At the summary judgment stage, though, the claimant only needs "some evidence" on this point, or a "fact issue," to save his claim.  *James*, 743 F.3d at 77–78.[15]

This Court has little trouble finding that Fidelity has met its low burden to show it had an arguable reason for denial.  The summary judgment evidence is rife with evidence pointing in the direction of suicide.  Specifically, the reason stated in Fidelity's denial letter (that "the medical

---

[15] The United States Court of Appeals for the Fifth Circuit, interpreting Mississippi law, has held that the claimant's ultimate burden of proof on "the lack of an arguable or legitimate basis" element as requiring "a preponderance of the evidence."  *James*, 743 F.3d at 71 n.6.

examiner" indicated the Decedent's manner of death as "Suicide" and that this had not been amended) was an arguable reason for denial. ECF No. 1-1 at 78. This Court then turns to the Mansoor Family's response, to determine if they have raised a genuine dispute of material fact to the contrary.

In July 2021, counsel for the Mansoor Family sent claim documents, including the amended death certificate, which changed the manner of death to accidental,[16] to Fidelity. Upon noticing that the death certificate was different from the original that Fidelity had received, Fidelity tasked investigators with exploring the discrepancy. The investigators contacted the medical examiner's office of Yalobusha County, Mississippi, and spoke with the coroner, who informed the investigators that the medical examiner's office still had the manner of death listed as suicide (and any amendment would have appeared as extra material with the certificate). Fidelity, thus, denied the claim, writing in the letter that:

> According to the medical examiner the manner of death is listed as Suicide, and it has not been amended. It appears the death certificate we received from your office was altered without the knowledge of the medical examiner and is being sent to the District Attorney for further review. Based on this information, the policy's suicide exclusion applies[.]

---

[16] This Court notes that the parties belabor whether the death certificates are admissible as evidence of manner of death. Fidelity cites an old case wherein the Mississippi Supreme Court's Justices, in dicta, opined that they did "not think the statute was intended to authorize certificates to be introduced as prima facie evidence except as to the prime physical cause of death." *Protective Association v. Cranford*, 102 So. 171, 173 (1924). The Mansoor Family retorts with a recent case, in which the Mississippi Supreme Court discussed hearsay exceptions applicable to death certificates. *Birkhead v. State*, 57 So. 3d 1223 (Miss. 2011).

This Court finds it unnecessary to rule on these issues herein, as, regarding the matter of bad faith on summary judgment, the original and amended death certificates are not being offered either as trial proof as to manner of death, nor as hearsay. Instead, they are being offered to show how Fidelity responded to the variant listings for manner of death—to determine whether Fidelity acted in bad faith to deny the Mansoor Family's claim. To that extent, this Court may consider the reasonable effect the different death certificates might have had on Fidelity.

ECF No. 1-1 at 78. The Mansoor Family's lawyer then responded, asking for reversal, explaining the situation and attaching the Chancery Court judgment ordering the death certificate to be corrected to accidental. ECF No. 71-19. Fidelity responded just two days later, noting that it had "reviewed" the response, and requested that the Mansoor Family's lawyer "submit an unaltered revised certified death certificate for review." ECF No. 71-20. Fidelity explained that the "previous death certificate [Fidelity] received was altered and sent to the U.S. District Attorney per their request." *Id.* The Mansoor Family omitted this last letter from the Complaint, instead pleading that the Mansoor Family received no response to their attorneys' letter. There is no record evidence showing that the Mansoor Family responded to the last-described letter from Fidelity.

Ultimately, the Mansoor Family "*agree[s]* with [Fidelity] that neither the Chancery Court Final Decree nor the amended death certificate was 'binding' on" Fidelity. ECF No .71 at 24 (emphasis added). The Mansoor Family argues only that Fidelity "acted in bad faith by overlooking these documents (and blindly accepting the [investigation report by Lieutenant Sullivant]) as if they did not exist simply because the documents undermine [Fidelity's] position." *Id.* The Mansoor Family also sees Fidelity's denial letter as an "accusation that [the Mansoor Family or its lawyers had] criminally 'altered' the Death Certificate." *Id.* at 20.

The Mansoor Family argues that Fidelity could have "pick[ed] up the telephone and call[ed] the Mississippi Department of Health and/or the Hinds County Chancery Court to confirm that the information conveyed to Defendant by [the Mansoor Family's] counsel … was true and correct and that the amended death certificate had not been criminally 'altered.'" ECF No. 71 at 23. Instead, claims the Mansoor Family, Fidelity "maintained its position that the Certificate of Death was 'altered,'" forcing the Mansoor Family "to file this lawsuit." *Id.* at 6.

Fidelity acted well within its right when it requested an "unaltered *revised* certified" copy of the death certificate for its review. An insurer does not act in bad faith "simply because it declined to believe or accept an insured's account of events." *Mahli, LLC v. Admiral Ins. Co.*, No. 1:14CV175-KS-MTP, 2015 WL 4915701, at *24 (S.D. Miss. Aug. 18, 2015) (reasoning that "[t]he proposition that an insurer must believe the word of its insured runs counter to an insurer's ability to defeat coverage on the basis of an insured's material misrepresentations") (citing *Clark v. Aetna Cas. & Sur. Co.*, 778 F.2d 242, 247 (5th Cir.1985); *McCord v. Gulf Guar. Life Ins. Co.*, 698 So. 2d 89, 92 (¶15) (Miss. 1997)). Furthermore, this response shows that Fidelity was at least willing to "hear out" the Mansoor Family's explanation and do some further investigation. The record does not show that the Mansoor Family ever gave Fidelity an opportunity to do that.

This Court also does not find that Fidelity specifically accused the Mansoor Family or its counsel of falsifying or "criminally 'alter[ing]'" the death certificate. Fidelity merely reported what it had learned from its investigation and notified the claimant about the referral of this information to law enforcement. Even if this was a veiled accusation, it would not be bad faith relevant to the denial of insurance benefits—Fidelity denied the claim based on its determination that the Decedent had committed suicide, not that his kin had falsified the death certificate.

The Mansoor Family then spends pages of its brief criticizing the report and investigation of Lieutenant Sullivant and, thus, Fidelity's heavy reliance on it as justification for the Suicide Exclusion. ECF No. 71 at 24–27. This Court notes that attacks on Lieutenant Sullivant's investigation may be relevant to the jury, when it determines the weight of evidence supporting suicide versus accidental death. His investigative weaknesses are only relevant to this Court's determination of bad faith on summary judgment to the extent that Fidelity knew or should have known *and* cared or should have cared about them. Initially, the Mansoor Family's arguments are

weak in that Fidelity had arguable reason to rely on the determinations of a state-level criminal detective and professional medical examiners.

The Mansoor Family, also, does not establish why Fidelity was or should have been aware of these supposed flaws as to make the basis for Fidelity's denial inarguable.  The main evidence the Mansoor Family cites comes from deposition testimonies and declarations.  This evidence arose during discovery in this matter, and thus post-dates Fidelity's alleged bad-faith denial.  The Mansoor Family has not established why Fidelity had a duty to seek that evidence.  *Even if* Fidelity had interviewed these deponents and declarants in the leadup to its decision, and got the same answers from them, the Mansoor Family has not established why Fidelity should have accepted said answers as true (particularly the self-serving statements of the Mansoor Family members); nor has the Mansoor Family established why Fidelity would not have also uncovered further evidence of suicide that arose during discovery (for instance, if Fidelity had interviewed William Alias and learned the information he stated at deposition).

The Mansoor Family also relies on the report of their expert consultant, an accident reconstructionist, who opined that "that [the Decedent's] truck was traveling just 24-26 miles per hour at the time it collided with the concrete culvert."  ECF No. 71 at 26.  The Mansoor Family impliedly contends this low speed contradicts the theory that the Decedent crashed his car intentionally, so as to kill himself.  The Mansoor Family faults both Lieutenant Sullivant and Fidelity, neither of whom, says the Mansoor Family, made any "attempt to determine the speed of the truck" before reaching their conclusions about the Decedent's motives.  *Id.*  The Mansoor Family does not indicate that it ever sent its expert's report (which was generated in 2019) to Fidelity prior to bringing suit.  The Mansoor Family does not explain how their report creates a genuine dispute of fact regarding whether Fidelity had some arguable basis for denial.  *Even if*

Fidelity had independently hired the same expert that the Mansoor Family did and obtained the same report, it would have read that expert's conclusion that:

> The impact speed range, while seemingly low, can and does in my opinion produce significant injuries. Especially in this case where the airbag was not deployed. It is very likely that this impact force could have yielded incapacitating injuries to Mansoor which could have precluded Mansoor from taking any physical post-impact actions.

ECF No. 16-2 at 6 (Smith Report).



*Id.* at 3 (a photo of the crashed truck). This would have maintained Fidelity's arguable basis for denial, even in light of the expert's concomitant, yet conclusory opinion that the Decedent "wearing his seatbelt and hit the culvert at around 25 mph" is "not, on the surface, the behavior of a suicidal individual." (This Court also has not rendered an opinion as to whether the expert is qualified to give either opinion at trial). Fidelity also could still have arguable basis to believe the Decedent shot himself, regardless of the reason his car left the road. This Court finds no genuine issue of material fact to dispute that Fidelity "had an arguable or legitimate basis for its" denial. *See James*, 743 F.3d at 77.

This Court, therefore, also presently must dismiss the Mansoor Family's claim for punitive damages. Under Mississippi law, "punitive damages [are] an extraordinary remedy which are allowed with great caution and within narrow limits." *Wilson v. State Farm Fire and Cas. Co.*, 761

So.2d 913, 921 (Miss. Ct. App. 2000). By statute, such plaintiffs must prove "by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65. This Court finds that the Mansoor Family has not raised a genuine issue of material fact on this point such that a reasonable factfinder could award punitive damages.

### C. The Mansoor Family members are not all proper plaintiffs.

Fidelity included the following line in the "Procedural background" section of its opening brief: "Although the plaintiffs include all members of Mansoor's immediate family (i.e., his wife Virginia and his four children, Anthony, Jr., Clare, Steven and Mary Kate), the only proper plaintiff is Anthony, Jr., the named beneficiary of the policy at issue." ECF No. 66 at 10. Fidelity, however, elected not to press this argument as one of its grounds for summary judgment. Fidelity, then, in its reply brief, explicitly argued that this Court should "dismiss all claims asserted by Virginia C. Mansoor, Steven S. Mansoor, and Virginia P. Mansoor." ECF No. 74 at 9.

At the oral argument, Fidelity's counsel re-raised this "lingering issue," and argued that the plaintiffs, other than "Anthony Mansoor III" should be dismissed because they have no contractual rights. Fidelity's counsel noted that he had thought the parties were "on the same page" on this issue and that the Mansoor Family merely had over-included parties in its complaint because it did not yet have a copy of the insurance policy naming Brie as the primary beneficiary.

This Court then permitted the Mansoor Family an additional sur-reply brief to respond to this argument. ECF No. 78. The Mansoor Family therein asks this Court to "strike the motion as untimely as it was filed well beyond the dispositive motion deadline." *Id.* at 2. This Court notes that such a motion to strike should have been made under a separate filing under the local rules. *See* L.U. Civ. R. 7(b)(3)(C) ("A response to a motion may not include a counter-motion in the

same document."). Regardless, this Court will not strike Fidelity's motion on this point—nor deem it waived or forfeited—because the Mansoor Family has not shown it is prejudiced by this tardy argument (having been given an opportunity to file a sur-reply and having had fair opportunity to take discovery on this point, as the master of its own claims). Further, Fidelity frames the issue as one of "standing,"[17] and "objections to standing are jurisdictional in nature and can be raised at any time." *Bankston v. Burch*, 27 F.3d 164, 167 (5th Cir. 1994) (citing Fed. R. Civ. P. 12(h)(3)).

Fidelity contends that Virginia, Clare, Steven, and Mary Kate Mansoor plaintiffs are "not parties to the insurance contract at issue" and therefore "have not suffered an injury-in-fact and lack standing to assert claims against Fidelity Life." ECF No. 74 at 9. The Mansoor Family argued that these plaintiffs are proper parties, with standing, because they are "intended third-party beneficiaries" of the policy. ECF No. 78 at 2.[18]

---

[17] The Supreme Court has clarified that "standing is not dispensed in gross," but must be established as to each claimant on each claim, as federal courts lack "the power to order relief to any uninjured plaintiff." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (internal citations omitted).

[18] The Mansoor Family alternatively argues that these plaintiffs have an actionable claim for "the independent tort of negligent and intentional infliction of emotional distress." ECF No. 78 at 4. This tort was not explicitly pled as a cause of action; rather, the Mansoor Family urges this Court to "infer" these causes of action by reading in-between the lines of the Mansoor Family's "bad faith" allegations. *Id.* at 5. The Mansoor Family had pled that Fidelity acted "outrageously," causing the plaintiffs "severe … emotional distress." ECF No. 1-1 at ¶26–28.

The supposedly intentional acts of Fidelity, however, predicating said distress, concern the denial of insurance benefits. The family members are not legal victims of this denial, even if they incidentally experienced emotional distress from it.

This Court also declines affirmatively to recognize whether or not the Mansoor Family stated "negligent or intentional infliction of emotional distress" as a cause of action, nor whether such a cause might be presented at trial as one of the bases for suit. Should the Mansoor Family wish that, the Mansoor Family can file a motion to that effect and this Court will consider it. *See* L.U. Civ. R. 7(b)(3)(C) ("Any motion must be an item docketed separately from a response.").

Under Mississippi contract law, as a "prerequisite" to a breach of contract action, "privity of contract [must] exist between the party damaged and the party sought to be held liable." *Burns v. Washington Sav.*, 171 So. 2d 322, 324 (Miss. 1965) (citing *Jones v. Mississippi Farms Co.*, 76 So. 880 (1917)).  Courts have "engrafted" an "exception," wherein "a third person may in his own right and name, enforce a promise made for his benefit even though he is a stranger both to the contract and the consideration." *Id.* (quoting 17 Am. Jur. 2d *Contracts* § 302, 722 (1964)).  For the "third person beneficiary to have a cause of action, the contracts between the original parties must have been entered into for [the putative beneficiary's] benefit, or at least such benefit must be the direct result of the performance within the contemplation of the parties as shown by its terms." *Id.* at 325.  In other words, there "must have been a legal obligation or duty on the part of the promisee to such third person beneficiary." *Id.*

On the other hand, a "mere incidental, collateral, or consequential benefit which may accrue to a third person by reason of the performance of the contract, or the mere fact that he has been injured by the breach thereof, is not sufficient to enable him to maintain an action on the contract." *Id.* at 324–25 (quoting *Contracts* § 307, 732–33).  A "third party who is a 'mere incidental beneficiary' to a contract lacks standing to sue for its breach." *Mortera v. State Farm Fire & Cas. Co.*, 561 F. Supp. 3d 684, 693 (S.D. Miss. 2021), *aff'd*, No. 21-60785, 2022 WL 1652834 (5th Cir. May 24, 2022) (quoting *Trammell v. State*, 622 So. 2d 1257, 1260 (Miss. 1993)).

The Mansoor Family's argument that all of them are "intended third-party beneficiaries" arises from a key fact:  In the margin of at least one copy of the policy, which the Mansoor Family attached to their complaint, Anthony scrawled an instruction for his son, the "Primary Beneficiary," to "use [the] funds for general household expenses to support family as directed by

his mother, Virginia P. Mansoor" (Anthony's wife, also known as "Ginny"). The Decedent then signed it.

The problem with this handwritten note is that it is not part of the contract with Fidelity. It is clear from the remainder of the policy that the Decedent completed and signed the application electronically. The copy of the insurance policy that Fidelity submits alongside its motion for summary judgment, authenticated by attorney declaration, bears no such handwritten note:



*Compare* ECF No. 1-1 at 41 (top), *with* ECF No. 65-1 at 46 (bottom). Therefore, the only reasonable conclusion this Court can draw is that the Decedent added this handwritten note to his own copy of the policy to instruct his son on how to use the benefit.

As Fidelity admits, Anthony G. Mansoor III is a contractually intended third-party beneficiary, and a proper plaintiff. He also is the only beneficiary listed on the Claimant's Statement that the Mansoor Family submitted to Fidelity. *See* ECF No. 65-1 at 201–03. Meanwhile, Virginia P. Mansoor, the Decedent's wife, as well as the unlisted children, Steven Scott Mansoor and Mary Kate Mansoor, must be mere "incidental" third-party beneficiaries lacking standing because their putative "benefit [would not] be the direct result of the performance within the contemplation of the parties as shown by [the contract's] terms." *Burns*, 171 So. 2d at

324–25.  According to the policy, "full payment of the policy proceeds to the Beneficiary discharges [Fidelity] from all claims," so Fidelity would be uninterested in enforcing the Decedent's instructions to his son.  ECF No. 65-1 at 43.  If the Decedent had wished to change his designation of beneficiaries to include other family members, he would have needed to provide "a written request" to Fidelity, rather than merely writing it on his own copy.  ECF No. 65-1 at 42.  This Court has seen no evidence that he did so.  Virginia P. Mansoor, Steven Scott Mansoor, and Mary Kate Mansoor must therefore be dismissed from this suit.

The term "contingent beneficiary" apparently is not defined in the policy, so this Court considers what to do with Virginia C. Mansoor, the Decedent's daughter, as a party.  *See generally* ECF No. 65-1 at 20–57.  This Court, then, must rely upon the plain and ordinary meaning of that term—reading the policy to mean that Virginia C. Mansoor would become the beneficiary if Anthony G. Mansoor III became "unable" to receive its proceeds.  *See Hartford Life & Acc. Ins. Co. v. Wilmore*, 31 F. App'x 832 (5th Cir. 2002) (recounting the BLACK'S LAW DICTIONARY 149 (7th ed.1999) definition for "contingent beneficiary" as "[t]he person designated in a life-insurance policy to receive the proceeds if the primary beneficiary is unable to do so.").  This Court, though, hesitates to dismiss Virginia C. Mansoor, with the morbid possibility that Anthony G. Mansoor III might become unable to receive any judgment to which he might be awarded during the pendency of this suit.  This Court, thus, does not dismiss Virginia C. Mansoor at this point.

### III.    CONCLUSION

**IT IS ORDERED** that Fidelity's motion for summary judgment is **DENIED-IN-PART** and **GRANTED-IN-PART**:

1. The motion is **GRANTED** to the extent that:

    a.  the Mansoor Family's bad faith and punitive damages claims are **DISMISSED**; and

b. in that the claims of Plaintiffs Virginia P. Mansoor, Steven Scott Mansoor, and Mary Kate Mansoor are **DISMISSED WITHOUT PREJUDICE** for want of standing.

2. The motion is **DENIED** to the extent that the claim for life insurance benefits shall proceed to trial.

The parties promptly shall contact this Court's chambers to schedule a Final Pretrial Conference, or other status conference, to determine the course forward towards resolving this matter through a jury trial.

**SO ORDERED AND AJUDGED this the  31st  day of          March          , 2025.**

**/s/ HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**